IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**SHARON M. NOEL**,

       Plaintiff,

v.                               **No. CIV-04-0227- MV/WPL**

**SAMUEL CATA**, **MALCOLM BOWAKETY,**
**STATE OF NEW MEXICO OFFICE OF INDIAN AFFAIRS,**
**SUCCEEDED BY THE STATE OF NEW MEXICO**
**BUREAU OF INDIAN AFFAIRS,**
**STATE OF NEW MEXICO,**

       Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment
[Docket No. 74].  After considering the motion, the response, and the relevant law, and otherwise
being fully informed, the Court finds that the motion should be **GRANTED**.

Plaintiff Sharon Noel brought this action under Title VII and 42 U.S.C. § 1983, seeking
money damages and reinstatement to her former job as a Deputy Director for the Office of Indian
Affairs (OIA) for the State of New Mexico.  She alleges that the OIA, through defendants Samuel
Cata (the interim acting Executive Director of the OIA), Malcolm Bowekaty (the Chairman of the
Commission of Indian Affairs), and through the Commission of Indian Affairs, retaliated against
her for reporting sexual harassment in the OIA workplace by her former supervisor, Terry
Aguilar.  Mr. Aguilar was the former Executive Director of the OIA.  Ms. Noel claims that the
OIA, through the Commission, retaliated against her by placing her on paid administrative leave

1

while an investigation was being conducted.  In addition, although Ms. Noel resigned from her job, she claims that she was constructively discharged because, between February 2002 and July 2002,  Mr. Cata did not allow her to fully perform all of the work activities in which she had formerly engaged.

## I.  Applicable legal standards

In order to state a prima facie case of retaliation, Ms. Noel must demonstrate that (1) she was engaged in protected opposition to discrimination; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.  *Stover v. Martinez*, 382 F.3d 1064, 1070-71 (10th Cir. 2004). Where, as here, there is no direct evidence of retaliation, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See Jeffries v. State of Kansas*, 147 F.3d 1220, 1231 (10th Cir. 1998).  Thus, Ms. Noel must first present a prima facie case of retaliation, which then shifts the burden to Defendants to produce a legitimate, nondiscriminatory justification for taking the disputed employment action.  *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004).  If Defendants satisfy their burden, Ms. Noel must provide evidence showing that the Defendants' proffered reasons are a pretext for discrimination. *See id.*  Pretext may be demonstrated by "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the reasons given for the employment action such that "a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 1241 (internal quotation marks omitted).  But mere conjecture that the Defendants acted with retaliatory intent will not suffice to establish pretext. *Id.*  In assessing whether Ms. Noel has made an appropriate showing of pretext, I must consider the evidence as a whole. *Id.*

2

"Constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit.  A finding of constructive discharge depends upon whether a reasonable person would view the working conditions as intolerable, not upon the subjective view of the employee-claimant." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005) (citation and footnote omitted).  In the Tenth Circuit, "the bar is quite high" for proving constructive discharge.  *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002).

Defendants move for summary judgment, arguing that Ms. Noel has failed to allege facts sufficient to demonstrate a prima facie case of either retaliation or constructive discharge. Specifically, they claim that no alleged facts are sufficient to establish an adverse employment action and that the undisputed facts do not support a finding of constructive discharge.

As I noted in a 2001 retaliation/constructive discharge case that Ms. Noel heavily relies on, the Tenth Circuit and the Supreme Court have clearly stated the standards to be applied in cases similar to the one at bar:

> Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to secure the just, speedy and inexpensive determination of every action.  Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the Court, viewing the record in the light most favorable to the non-moving party, determines that there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.

> The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. Once the moving party meets this burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for

3

trial.

        Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's position.  In such a situation, the moving party is entitled to judgment as a matter of law.

        The Tenth Circuit liberally defines the term 'adverse employment action.' Such actions are not simply limited to monetary losses in the form of wages or benefits.  Instead we take a case-by-case approach, examining the unique factors relevant to the situation at hand.  Here, Plaintiff must show more than a mere inconvenience or an alteration of job responsibilities.

*Keller v. Bd. of Educ.*, 182 F. Supp. 2d 1157, 1157 (D.N.M. 2001) (internal quotation marks and citations omitted).  I must keep in mind that, to be actionable, there must be "a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a significant change in benefits." *Annett*, 371 F.3d at 1237 (internal quotation marks omitted, emphasis added).

    With these principles in mind, I turn to the whole summary judgment record, focusing on undisputed or stipulated facts.  If facts are in dispute, I have viewed them in a light most favorable to Ms. Noel.

## II.  Material facts

The Commission of Indian Affairs had authority over the OIA, a state agency.[1] On November 27, 2001, while attending a conference in Spokane, Washington, Ms. Noel complained to Stacey Sanchez, who was the chairwoman of the Commission, about Mr. Aguilar's behavior. Ms. Noel was upset because Mr. Aguilar yelled at her and other female employees of the OIA

---

[1]This agency has since been replaced by the New Mexico Bureau of Indian Affairs.

when they failed to arrive at the conference at the time when he expected them.  In addition to this complaint, Ms. Noel complained that Mr. Aguilar not only sexually harassed the female employees in the OIA office, but that he also was mismanaging the office, inappropriately using his OIA cellphone, and inappropriately using the "office as a second office for his term as lieutenant governor of San Ildefonso" Pueblo.  Pl. 4/29/05 Depo. at 44.  Ms. Noel testified that, before she called Ms. Sanchez, she told Mr. Aguilar, "I'm sick of you and I'm sick of your shit. I've had it with you and your attitude.  I'm going to the Commission." *Id.* at 51.  When Mr. Aguilar "called her a short time later and told her to never cuss at him or threaten him [, s]he hung up on him." *Id.*  Upon her return to Santa Fe from Spokane, Ms. Noel received a directive from Mr. Aguilar suspending all travel and instructing all staff to report to his office on Friday, November 30 for a meeting.  Instead of obeying this directive, Ms. Noel attended a CLE seminar in Albuquerque that she needed to maintain her licensure as an attorney in the Navajo Nation, and that Mr. Aguilar had already approved and the OIA had paid for.  Angered by her disobedience, Mr. Aguilar found Ms. Noel at the CLE and asked for her resignation. *Id.* at 208.  When she refused to resign, Mr. Aguilar handed her a letter terminating her employment, citing "gross insubordination." *Id.* at 52, Def. MSJ Ex. O.

Ms. Noel immediately reported the termination to Commissioner Sanchez and to Commissioner Bowakety, who told her to "return to work on Monday and stand up to him. Don't let him think that he can intimidate you." Pl. 4/29/05 Depo. at 69.  The Commission then formally rescinded the termination in writing. Def. MSJ Ex. I. On Monday, December 3, 2001, the Commission placed Mr. Aguilar on paid, administrative leave pending investigation of the harassment and mismanagement claims.  Later that afternoon it also placed Ms. Noel on paid,

administrative leave, explaining that it wanted to "afford an objective review and to minimize harassment or retaliation." *Id.*

Ms. Noel was one of two Deputy Directors. Tom Talache, the second Deputy Director for the OIA, immediately resigned upon hearing of Mr. Aguilar's administrative suspension. He was upset because, instead of putting him in charge of the office as second in command, the Commission put Tina James-Tafoya, a planning director under Ms. Noel's supervision, in charge of the OIA. The Commission hired an independent investigator to investigate the claims and hired an independent attorney to advise them on how to handle the investigation. The Commission asked Ms. Noel not to go to the office or to speak to other employees during the investigation.

On January 18, after carefully considering the evidence gathered by the investigator, the Commission decided to terminate Mr. Aguilar's employment, *see* Def. MSJ, Ex. 15, and to return Ms. Noel to work in the same position, and at the same salary and with the same benefits, as she had previously occupied. Their decision was met with substantial opposition and criticism from both Indian and government leaders. The Eight Northern Indian Pueblos Council requested a formal investigation by the Attorney General's office into Mr. Aguilar's termination; it hired him as a lobbyist in January 2002. *See* Pl. Resp. to MSJ Ex. 46, Ex. 55 at 11. Mr. Talache was elected as the governor of Nambe Pueblo in January 2002.

Mr. Cata, who was initially hired to replace Mr. Talache as the second Deputy Director, was appointed as interim acting Executive Director in mid-December 2001. Mr. Cata had no previous involvement with the OIA, and, therefore, no "dog in the fight." Mr. Cata was appointed "under a series of 90-day emergency temporary agreements, and during that time the commission indicated that they were going to do a national search for a director." Def. Reply to

MSJ, Cata Depo. at 126.  Mr. Cata applied for the permanent position, but no final decision on the appointment was made until August 2002.  As the acting director, he was instructed to focus on three things:  fully briefing the governor's office on capital projects, the status of an OIA internal audit, and the status of the community interest programs that the OIA was monitoring and that were financed with government money.  Pl. Resp. to MSJ Ex. 56 at 27-28.

Mr. Cata called Ms. Noel to let her know that her administrative leave ended sometime around January 18, 2002.  Pl. 7/19/05 Depo. at 319.  She took two days of annual leave and returned to work in either late January or early February, after she returned from a trip.  Pl. 4/29/05 Depo. at 40, 215-16.  Ms. Noel testified that Mr. Cata was always courteous to her and that they got along well; that he was never mean or said anything inappropriate to her, Pl. 1/14/04 Depo. at 39; and that he granted her requests for vacation time in March and April, 2001, Pl. 4/29/05 Depo. at 217-18; and her numerous requests for leave without pay.

There was no written job description for Ms. Noel's job, and Mr. Cata testified that he had "no idea what her duties were prior" to his appointment.  Pl. Resp. to MSJ Ex. 56 at 33.  There were documents describing Ms. Noel's activities the previous year, but there was no evidence that anyone had brought them to Mr. Cata's attention.  Ms. Noel testified that she thought she was "supposed to oversee the office."  Pl. 1/14/04 Depo. at 13.  She testified that Mr. Aguilar had "delegated supervisory authority to [her] over the ladies that worked there and wanted me to get to know the tribes and get to know the issues that were out there from a legal standpoint."  *Id.* Mr. Bowakety testified that the deputy directors' duties were determined by the executive director.  Pl. Resp. to MSJ Ex. 57 at 62.

Upon her return to work in February 2002, Mr. Cata asked Ms. Noel to attend legislative

7

sessions in Santa Fe that may affect Indian affairs, but she declined for fear that she might see Mr. Aguilar there.  She also declined to attend meetings regarding Indian tax issues because Mr. Aguilar was involved in those matters in his position as lieutenant governor of San Ildephonso Pueblo.  *See* Pl. Resp. to MSJ, Ex. 56 at 65-66.  And she asked not to be included in any activities involving Bernice Romero, who had been Mr. Aguilar's executive assistant and who maintained that position after Mr. Cata became acting director.  Mr. Cata consented to her requests.

Ms. Noel worked at the OID office for parts of six months in 2002: February through July, *see* Pl. 1/14/04 Depo. at 60, Pl. 4/29/05 Depo at 98, but requested and was granted eight weeks of leave without pay to do some paid legal work for two non-profit organizations in the Shiprock area during June and July.  *Id.* at 168-70, 219.  She told Mr. Cata that she needed to be in the Shiprock area to receive some traditional Navajo healing treatments, and he consented to all of her requests.

The record shows that Ms. Noel asked to perform, performed, or was asked to perform, the following work.  In mid-February 2002, Ms. Noel and her subordinates prepared a brief memo proposing travel and other activities for the next year.  Def. Reply to MSJ Ex. 59.  The women wanted to attend various Pueblo and Navajo Nation meetings in March and April to update the Indian leaders on the 2002 laws affecting them.  *Id.*; Pl. 7/19/05 Depo. at 307.  According to Ms. Noel, Mr. Cata reviewed the memo and said, "hold off" on the travel plans.  *Id.* at 303-04.  When she complained to Mr. Bowakety that she thought Mr. Aguilar had "done damage with the pueblos and they didn't want to see me working out there anymore," she claims that he responded, "well, sometimes in our lives we work best in the background."  Pl. 1/14/04 Depo. at 43.  This is the only comment from any defendant that Ms. Noel presents as alleged proof of a

retaliatory motive.

But the February 14 memo included plans for Ms. Noel to attend the Federal Indian Bar Conference in Albuquerque, the Navajo Nation Bar conference in Durango, and the Navajo Nation Council Summer Session, and the record shows that she traveled to and attended these seminars and meetings. Ms. Noel did not recall ever requesting any other specific travel or any other specific projects or other work that Mr. Cata turned down. Pl. 7/19/05 Depo. at 306-07. Besides traveling to the pueblos to update them on the 2002 laws, the only other things Ms. Noel proposed to do between February and July in her February 2002 memo were to set up "outreach" tables at the Gathering of the Nations Pow Wow and at the "HPD Gov't to Gov't. conference in Santa Fe," in April and May. Pl. Resp. to MSJ Ex. 59 at 2. The record does not show whether she performed these activities.

Mr. Cata asked Ms. Noel to oversee and follow up on the OIA internal audit problems on which he was instructed to give a status report. Pl. Resp. to MSJ, Ex. 56 at 35-36. She testified, however, that she did nothing because she felt that the employee responsible for the information in the audit was competent. Pl. 4/29/05 Depo. at 91-94. The next time she asked for work, Mr. Cata assigned several community interest contract projects to her.

It is undisputed that Ms. Noel supervised the same individuals she had supervised before; was asked to assist in interviewing, hiring and supervising a new community service contact employee and capital improvement project planner and to be involved in the hiring of the permanent executive director; and continued overseeing the development of written job descriptions for classified employees. Pl. 4/29/05 Depo. at 8-13, 100, 118. She performed performance evaluations on the employees she supervised. *Id.* at 24-25. She was given fifteen

9

community service contracts to monitor, *see id.* at 111, and was told by Mr. Cata "to get out there and know what these people are doing," Pl. 1/14/04 Depo. at 42.   In March she traveled to Shiprock for two days to monitor two of the service contracts.  *Id.*  She went to the Institute of American Indian Arts, to Santa Ana Pueblo, and to Isleta Pueblo for site visits related to these service contracts, and to a Statuary Hall meeting in Jemez.  Pl. 7/19/05 Depo. at 329-330, 332, 325-26.   She followed up with, and had meetings about, a sexual harassment claim filed by another employee.  *Id.* at 329-331.   She went to Durango, Colorado for the Navajo Nation Bar Conference.  *Id.* at 334.   She was asked by the Commission to review the Federal Indian Education Act, but did not do so because "they weren't able to [re]produce that document" because it was so voluminous.  *Id.* at 346.   She was also asked to analyze an Indian education bill in the NM legislature.  *Id.*; Def. MSJ Cato Depo. at 38-43.

Ms. Noel was left in charge of the OIA office for ten days in June when Mr. Cata took vacation.  Pl. 4/29/05 Depo. at 98.   She testified that Mr. Cata appointed her to the Martin Luther King Commission, but testified she was "not allowed to go to that."  *Id.*  Her February 14, 2002, memo to Mr. Cata stated, however, that she "would like to get out of this one if" she could.  Pl. Resp. to MSJ Ex. 59 at 6.   Ms. Noel attended meetings with Navajo Nation representatives, Pl. 4/29/05 Depo. at 116, and with the New Mexico Tribal Health Care Authority, *id.* at 213.   She went to Window Rock, Arizona for the Navajo Summer Council session and also attended the Navajo Eastern Agency's women's conference in Crownpoint, *id.* at 212, where she spoke at a seminar for the Institute of Technology's women's course, *id.* at 145.   She served on a Popé Monument commission and on a Four Corners Monument task force on behalf of the OIA.  Def. MSJ Cata Depo. at 61-64.

Mr. Cata took on all of the other traveling assignments himself, including attending AIPC, Northern, and Southern Pueblo meetings and meeting with Navajo chapters and with the Eastern Agency president, some of which were activities that Ms. Noel had attended in the previous year. *Id.* at 41.  But another employee testified that Mr. Cata took on most of the office travel, and not just Ms. Noel's.  Def. MSJ Depo of Tina James-Tafoya at 102.

In late July, Ms. Noel submitted her resignation.  The reasons she gave were twofold. First, she complained that Mr. Cata allowed Ms. Romero "to prolong the issue of Terry Aguilar's removal" by talking about it to new employees and by being hostile and uncooperative with her and other employees.  Def. MSJ, Ex 12.  Second, she complained that her position had changed "drastically from what [she] performed before" in that she had been "encouraged to remain in the office."  *Id.*  She believed that this change was in retaliation for reporting Mr. Aguilar's harassment and made it look like she was the one at fault.  *See id.*

In August Ms. Noel began working for a non-profit organization and later continued doing work for the other non-profit organizations that she had previously assisted.  Pl. 4/29/05 Depo. at 165, 170.  In November 2002, Ms. Noel filed a charge of discrimination with the NM Human Rights Division and EEOC, stating that she had been "constructively discharged after being subjected to  blatant retaliation . . . consisting of having all my duties and responsibilities immediately [taken] away from me after filing [a Title VII] charge."  Def. MSJ Ex. M.

### III.  Analysis

**A.  Paid administrative leave.**  I conclude that placing Ms. Noel on paid administrative leave during a politically-sensitive investigation into serious charges of sexual harassment and gross insubordination, and returning her to her position as soon as the investigation was complete

11

and a decision had been made, was not an adverse employment action as a matter of law. Although the Tenth Circuit has not addressed paid administrative leave as an adverse action, many other circuits have.  They unanimously hold that such an action in these circumstances is not adverse.  *See, e.g., Singletary v. Mo. Dep't of Corr.*,  423 F.3d 886, 888-92 (8th Cir. 2005) (holding that suspension with pay and benefits lasting eighty-nine days during investigation into alleged wrongful act not adverse employment action); *Peltier v. United States*, 388 F.3d 984, 988-89 (6th Cir. 2004) (holding that employee placed on paid administrative leave pending outcome of an investigation did not suffer adverse employment action under Title VII); *Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000) (holding that police officer did not suffer adverse employment action by being placed on paid administrative leave during investigation); *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (holding that placement of employee on short administrative leave with pay to allow time for internal investigation of complaint not an adverse employment action); *Haddon v. Executive Residence at White House*, 313 F.3d 1352, 1363-64 (D.C. Cir. 2002) (holding that internal investigation involving paid administrative leave and suspension of White House pass did not qualify as adverse employment actions).  Ms. Noel has produced no evidence from which a reasonable juror could conclude that the Commission had a retaliatory motive for placing her on paid administrative leave.  I conclude, therefore, that Defendants are entitled to summary judgment on this claim.

     **B.  Constructive discharge.**  I next turn to the question whether Ms. Noel has presented sufficient evidence to show that she was constructively discharged, which would, of course, be an adverse employment action.  As mentioned above, to establish constructive discharge, Ms. Noel must provide evidence that the changes in her job duties were so significant and unwarranted that

"a reasonable person would view the working conditions as intolerable." *MacKenzie*, 414 F.3d at

1281. A recent New Mexico Supreme Court case summarized examples of constructive

discharge:

> Examples of adverse employment actions that rise to the level of constructive discharge include "a humiliating demotion, extreme cut in pay, or transfer to a position in which [the employee] would face unbearable working conditions." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 2347, 159 L. Ed. 2d 204 (2004). Other examples include: an employer's threat of being fired; overt pressure to resign and accept early retirement; dramatic cut in pay; and retaliatory measures (*e.g.*, discrimination, unreasonable criticism, involuntary transfer). *See Douglas v. Orkin Exterminating Co.*, No. 98-8076, 2000 WL 667982, at *4, 215 F.3d 1336 (10th Cir. May 23, 2000) (unpublished opinion) (holding that evidence of a demotion and lower pay supported reversal of summary judgment); *Keller v. Bd. of Educ.*, 182 F. Supp. 2d 1148, 1157 (D.N.M. 2001) (holding that constructive discharge claim was supported by the record and justified denial of summary judgment when employee was reassigned to a job without a job title and description, her office was in a supply closet, and her salary was cut by more than one-half, amounting to less than her retirement benefit); *Gower v. IKON Office Solutions, Inc.*, 177 F. Supp. 2d 1224, 1233 (D. Kan. 2001) (holding claim of constructive discharge was supported by evidence that the worker was given twenty-four hours to sign a new contract limiting the number of accounts he could service, reducing his commission in one account from $8,000 to $3,000 per month, and changing his reporting requirements); *Goodwin-Haulmark v. Menninger Clinic, Inc.*, 76 F. Supp. 2d 1235, 1239 (D. Kan.1999) (concluding that overt pressure to resign raised genuine issues of material fact to justify denial of summary judgment regarding constructive discharge); *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 993 (10th Cir. 1994) (finding that systematic threats and pressure to retire constituted constructive discharge).

> The specific facts of the employment condition, and the severity of its impact upon the employee, are pivotal in determining whether the claim rises to the level of constructive discharge. In many cases, the circumstances surrounding resignation are not egregious enough to support a claim. *See Gioia v. Pinkerton's, Inc.*, 194 F. Supp. 2d 1207, 1228 (D.N.M. 2002) (stating that plaintiff's change in duties and pay reduction of approximately 9.1% did not constitute constructive discharge); *Garrett*, 305 F.3d at 1221 (intimidating behavior by supervisors resulting in lower performance evaluations and repeated denial of requests to transfer did not amount to constructive discharge); *Baker v. Perfection Hy-Test*, No. 95-6091, 1996 WL 1162, *9-11, 74 F.3d 1248 (10th Cir. Jan. 16, 1996) (unpublished opinion) (holding a demotion, a ten percent reduction in pay and

13

> jokes by co-workers directed at plaintiff did not amount to constructive discharge); *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 858 (10th Cir. 2000) (holding that change in location of desk, monitoring of telephone calls, ostracism by fellow employees, and suggestion by supervisor to transfer did not amount to constructive discharge); *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (stating that "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign") (quoted authority omitted).

*Gormley v. Coca-Cola Enterprises*, 109 P.3d 280, 283 (N.M. 2005).

As described above, as a matter of law the record simply does not support a view that Defendants made the OIA workplace so intolerable that Ms. Noel had no choice but to quit. The record shows that Ms. Noel returned to her principle job of supervising the OIA office upon her return, including conducting performance evaluations, hiring new staff members, and overseeing the development of job descriptions. She was offered opportunities for legal analysis, like covering the legislative sessions and analyzing various legislation that would impact Indian education. Although she complains that she was not given enough legal work, Ms. Noel did not suggest performance of any legal work in the memos she submitted to Mr. Cata except for updating the various tribes on the 2002 legislation that may affect them. Given the three tasks Mr. Cata was asked to accomplish during his interim, it was reasonable for Mr. Cata to assign related tasks to Ms. Noel to accomplish that goal. In short, Ms. Noel was given meaningful work relevant to the OIA's goals, including supervising the internal audit and monitoring the community interest projects.

Ms. Noel continued to attend Indian functions and meetings related to OIA goals. That she desired to travel more does not weigh in favor of finding that her workplace was intolerable. "[N]ot everything that makes an employee unhappy qualifies as retaliation." *Sanchez v. Denver*

14

*Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998) (quotation marks omitted).  It was completely reasonable for Mr. Cata to attend the pueblos' political meetings in March and April and to have her hold off on attending them, given the fact that he was new in his position, that the travel budget was limited, and that the political climate in many of the pueblos was not receptive to Ms. Noel at that point in time.  Further, Ms. Noel's job duties necessarily varied, depending upon the changing goals of the OIA and the needs of the executive director.  Ms. Noel had spent the previous year "getting to know" the pueblo leadership and familiarizing herself with the legal issues at the pueblos, and she presented no evidence that traveling to the pueblos as much as she had the previous year was critical to performing her job effectively.  This is not a situation in which Ms. Noel's job assignments were unreasonably and drastically altered.  Viewing the facts objectively and considering the totality of the circumstances as the law requires, no reasonable jury could conclude that defendants made Ms. Noel's work situation so intolerable that she had no choice but to quit.

Because Ms. Noel has not presented sufficient evidence to establish a prima facie case of retaliation or constructive discharge, summary judgment must be granted to Defendants.  *See Stover*, 382 F.3d at 1070-71 ("Mere . . . alterations of job responsibilities do not rise to the level of an adverse employment action.").

**THEREFORE**, Defendants' Motion for Summary Judgment [Docket No. 74, filed 11/04/2005] is **GRANTED**.  Plaintiff's Motion for Partial Summary Judgment [Docket No. 68, filed 10/24/2005] is **DENIED** as moot, as is her Motion for Leave to File Materials Authenticating Challenged Exhibits [Docket. No. 90, filed 3/01/2006].  Plaintiff's claims are dismissed with prejudice, and this action is **DISMISSED**.

**IT IS SO ORDERED.**

_____

**MARTHA VÁZQUEZ**
**CHIEF UNITED STATES DISTRICT JUDGE**